## CHESAPEAKE & VIRGINIAN COAL CO. v. RICH BLOCK COAL CO.

(Circuit Court of Appeals, Fourth Circuit.   July 3, 1923.)

No. 2096.

Evidence ⊙⇒450(8)—Terms of unambiguous written contract cannot be varied by parol.

A written contract for the sale and purchase of the entire output of a coal mine, of the grade as produced and shipped during the term of the contract, is for the whole product of the mine of merchantable coal, and is unambiguous, and the buyer cannot refuse to accept shipments because of variance in grade, nor because of an alleged verbal agreement that a certain grade would be maintained.

In Error to the District Court of the United States for the Southern District of West Virginia, at Huntington; George W. McClintic, Judge.

Action at law by the Rich Block Coal Company against the Chesapeake & Virginian Coal Company.  Judgment for plaintiff, and defendant brings error.   Affirmed.

Douglas W. Brown, of Huntington, W. Va. (Alfred B. Percy, of Lynchburg, Va., and Fitzpatrick, Brown & Davis, of Huntington, W. Va., on the brief), for plaintiff in error.

Connor Hall, of Huntington, W. Va. (Deegan & Hall, of Huntington, W. Va., on the brief), for defendant in error.

Before WOODS and WADDILL, Circuit Judges, and GRONER, District Judge.

WOODS, Circuit Judge. On April 22, 1920, defendant made a contract in writing to purchase coal from the plaintiff, the particulars of the sale being thus expressed:

"Quantity: Entire output coal.
"Grade: As produced and shipped.
"Delivery: As produced and shipped during term of this contract.
"Price: $4.60—per ton of 2,000 lbs. f. o. b. cars at mines.
"Contract effective: April 22, 1920, to March 31, 1921, inclusive."

The paragraph exempting the seller from liability for failure to deliver due to strikes or similar causes contained this provision:

"In such case the sellers, during such period, may apportion and ship only such proportion of the grade of coal hereby contracted for, available to the sellers, as this contract tonnage shall bear to the total tonnage of the said grade of coal which the sellers have contracted to sell under this and all other contracts."

By modification of July 30, 1920, it was agreed that the defendant should take 1,500 tons a month of plaintiff's output at $4.60 per ton, and should sell the surplus over 1,500 tons a month in the open market for a commission of 6 per cent. By agreement of October 16, 1920, the price was increased to $5.08 from August 16, 1920.

In this action against the buyer for breach of contract the jury found for the plaintiff. There is no dispute that the plaintiff owned only one mine, and that on December 7, 1920, the defendant refused to receive any further shipments from the mine under the contract.

Evidence was received that at the date of the contract and for some time before the Newport News Coal Exchange had established coal pools. The number of each pool indicated the grade of the coal held in that pool to the credit of the owners. It was further proved that at the time of the contract plaintiff's coal was graded as belonging to pool No. 6, and that afterwards, before the defendant rejected it, the officers of the Exchange demoted it to pool No. 56, a lower class, because of alleged deterioration in quality; that defendant on December 7, 1920, assigned this as its reason for refusing to accept further shipments under the contract.

Defendant complains that it was not allowed to introduce testimony to the effect that at the time it made the contract with plaintiff it was under contract to sell coal of a grade assigned to pool No. 6 in the Exchange; that plaintiff was informed of this fact; that plaintiff had contracted orally that the coal delivered under the written contract should be of that grade; that the defendant had not inspected the coal produced by plaintiff; that the price stated in the contract was a fair price for pool No. 6 coal. All this testimony was rejected on the ground

that defendant had agreed in writing to take plaintiff's "entire output" of the grade "as produced and shipped," and that it could not be allowed to add to plaintiff's undertaking to deliver its output "as produced and shipped" the obligation to produce and ship coal graded by the Exchange as pool No. 6.

The contract is complete on its face, without ambiguity. The entire output of the grade as produced and shipped meant the whole product of merchantable coal. 35 Cyc. 404; 24 R. C. L. § 458; Appalachian Power Co. v. Tate, 90 W. Va. 428, 111 S. E. 150; 102 Am. St. Rep. 611, note. The defendant knew of the grades and pools when the contract was made. That was the time to notify the seller that coal of pool No. 6 grade would be demanded and to insist upon that grade being specified in the contract. The court cannot now impose the additional burden on the plaintiff on the faith of what the defendant now says the written contract should have been. Seitz v. Refrigerating Co., 141 U. S. 510, 12 Sup. Ct. 46, 35 L. Ed. 837; 15 Rose's Notes, 849; 22 C. J. 1117–1119. The testimony was properly excluded. The charge to the jury was in accordance with the rule we have stated.

This conclusion makes unnecessary consideration of the position taken by the plaintiff that defendant waived the alleged oral stipulation that the coal should be classified by the Exchange in pool No. 6 by receiving on the contract the output of the mine without objection in September, October, November, and December, after it had been demoted to pool No. 56.

Petman, an agent of the defendant, testified that on December 6th Montgomery, president of the plaintiff corporation, agreed with him that after that date the contract to purchase should end, and that defendant should sell plaintiff's output of coal in the market and account to plaintiff for the proceeds, less a commission of 6 per cent. Montgomery denied that he made such an agreement. The district judge properly submitted this issue to the jury, directing them to take into consideration all the facts and circumstances bearing on it. It was not reversible error for the judge to indicate his opinion against the probability of such an agreement by the seller to forfeit the advantage of its contract of sale on a falling market.

The instruction given to the jury, as to the authority of the president of the plaintiff company to cancel the contract of sale of the output of the mine and substitute an agreement to deliver the output to defendant for sale on a commission of 6 per cent., is not as clear as could be wished. We think on the whole, however, the instruction meant that the president had no such inherent power, but his authority from the board of directors to make such an agreement must be proved either expressly or by facts from which the grant of the authority could be inferred. If a more definite instruction was desired, it should have been asked.

The defendant submits the District Court erred in instructing the jury that if they found for the plaintiff they should include $601, the aggregate of unpaid balances on coal shipped under the contract. The instruction was given in substance that acceptance by plaintiff of payments for coal sold and invoiced for the account of plaintiff by de-

fendant was a fact to be considered along with other evidence, circumstantial and direct, in deciding whether the contract of purchase had been canceled. It seems evident that, if there was no cancellation of the contract of purchase by substitution of a contract to sell on commission, the plaintiff was entitled to recover the difference between the contract price and the remittances made for the coal delivered to the defendant.

There is no substantial objection to the instruction given as to the measure of damages for refusal of the defendant to receive the coal.

Affirmed.